# CR 15 381

WMP:CAO/CLN/RMT/BDM
F. #2012R00103

FILED
CLERK

2015 AUG -5 PM 2:15

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

     - against -

VITALY KORCHEVSKY,
VLADISLAV KHALUPSKY,
LEONID MOMOTOK and
ALEXANDER GARKUSHA,

             Defendants.

– – – – – – – – – – – – – –X

**I N D I C T M E N T**

Cr. No. _____
(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1),
1349, 1956(h), 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

**ROSS, J.**

**REYES, M.J.**

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.     The Defendants and Relevant Co-conspirators

        1.      The defendant VITALY KORCHEVSKY was a resident of Glen Mills,

Pennsylvania, and controlled brokerage accounts at, inter alia, E*Trade, Jefferies, JP Morgan,

Scottrade, Fidelity and TD Ameritrade. KORCHEVSKY was formerly a hedge fund manager

and investment adviser who was registered with the Securities and Exchange Commission

("SEC") from 2005 through 2009.

        2.      The defendant VLADISLAV KHALUPSKY was a resident of Brooklyn,

New York and Odessa, Ukraine, and controlled brokerage accounts at, inter alia, Merrill Lynch.

KHALUPSKY was formerly a broker-dealer registered with the SEC from 2000 through 2008.

        3.      The defendant LEONID MOMOTOK was a resident of Suwanee, Georgia,

and controlled brokerage accounts at, inter alia, TD Ameritrade.

4.     The defendant ALEXANDER GARKUSHA was a resident of Alpharetta and Cumming, Georgia.   GARKUSHA was the Executive Vice President of APD Developers, Inc., a company based in Alpharetta, Georgia, that designed and built residential communities and condominiums.

5.     Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a resident of Alpharetta, Georgia, and controlled brokerage accounts at, inter alia, Charles Schwab, E*Trade, Fidelity, Merrill Lynch and TD Ameritrade.   Co-Conspirator 1 was the owner of APD Developers, Inc.

6.     Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a resident of Alpharetta, Georgia, and controlled brokerage accounts at, inter alia, Charles Schwab, E*Trade, Fidelity, Merrill Lynch and TD Ameritrade.   Co-Conspirator 2 was the son of Co-Conspirator 1.

7.     Co-Conspirator 3, an individual whose identity is known to the Grand Jury, was a resident of Alpharetta, Georgia and Kiev, Ukraine.   Co-Conspirator 3 was related to Co-Conspirator 1 and Co-Conspirator 2.

8.     Co-Conspirator 4, an individual whose identity is known to the Grand Jury, was a resident of Kiev, Ukraine.

9.     Co-Conspirator 5, an individual whose identity is known to the Grand Jury, was a resident of Kiev, Ukraine.

II.     The Targeted Entities

10.     PR Newswire Association LLC ("PR Newswire"), a wholly-owned subsidiary of UBM plc, was a global company with its headquarters in New York, New York.   PR

2

Newswire was in the business of, <u>inter alia</u>, publishing and disseminating press releases for corporate clients.

11.     Marketwired L.P. ("Marketwired") was a privately-held company with its global headquarters in Toronto, Canada and its U.S. headquarters in El Segundo, California. Marketwired was in the business of, <u>inter alia</u>, publishing and disseminating press releases for corporate clients.

12.     Business Wire, a wholly-owned subsidiary of Berkshire Hathaway, was a global company with its headquarters in San Francisco, California.   Business Wire was in the business of, <u>inter alia</u>, publishing and disseminating press releases for corporate clients.

13.     PR Newswire, Marketwired and Business Wire (collectively, the "Victim Newswires") were authorized by the SEC to issue press releases for, <u>inter alia</u>, the following publicly-traded companies: Acme Packet, Inc. ("APKT"); Aéropostale, Inc. ("ARO"); Align Technology, Inc. ("ALGN"); ANN INC. ("ANN"); AutoNation, Inc. ("AN"); Avon Products, Inc. ("AVP"); The Boeing Company ("BA"); CA, Inc. ("CA"); Caterpillar Inc. ("CAT"); Cepheid ("CPHD"); Clorox Co. ("CL"); Darden Restaurants, Inc. ("DRI"); DealerTrack Technologies, Inc. ("TRAK"); Deere & Company ("DE"); Dendreon Corp. ("DNDN"); Dick's Sporting Goods, Inc. ("DKS"); E. I. Du Pont De Nemours and Company ("DD"); Dycom Industries, Inc. ("DY"); Edwards Lifesciences Corporation ("EW"); Foot Locker, Inc. ("FL"); GeoEye, Inc. ("GEOY"); GNC Holdings, Inc. ("GNC"); Guess?, Inc. ("GES"); The Hain Celestial Group, Inc. ("HAIN"); Hertz Global Holdings, Inc. ("HTZ"); Hewlett-Packard Company ("HPQ"); The Home Depot, Inc. ("HD"); LDK Solar Co., Ltd. ("LDK"); Legg Mason, Inc. ("LM"); MasTec, Inc. ("MTZ"); Lincoln Electric Holdings, Inc. ("LECO"); Marriott International ("MAR"); MICROS Systems, Inc. ("MCRS"); NetApp, Inc. ("NTAP"); OmniVision Technologies, Inc. ("OVTI"); Oracle

Corporation ("ORCL"); Overstock.com, Inc. ("OSTK"); Owens Corning ("OC"); Panera Bread Company ("PNRA"); PAREXEL International Corporation ("PRXL"); Parker-Hannifin Corporation ("PH"); Payless ShoeSource ("PSS"); The PNC Financial Services Group, Inc. ("PNC"); RadioShack Corporation ("RSH"); Silicon Graphics International Corp. ("SGI"); Synopsys, Inc. ("SNPS"); Tesla Motors, Inc. ("TSLA"); Texas Instruments Incorporated ("TXN"); TreeHouse Foods, Inc. ("THS"); VASCO Data Security International, Inc. ("VDSI"); VMware, Inc. ("VMW"); and Weight Watchers International, Inc. ("WTW") (collectively, the "Target Companies").

III.    Relevant Terms and Definitions

14.    An "Internet Protocol" address ("IP address") was a numerical label assigned to each device (e.g., computer, printer) participating in a computer network that used the Internet Protocol for communication.   An IP address served two principal functions: host or network interface identification and location addressing.   Because every device that connected to the internet used an IP address, IP address information could identify computers and other devices that were used to access the internet.

15.    A "Uniform Resource Locator" ("URL") was a computerized reference to a resource that specified the location of the resource on a computer network and a mechanism for retrieving it.   URLs most commonly referenced web pages.

16.    "Malware" referred to malicious computer software programmed to, inter alia, gain and maintain unauthorized access to computers and to identify, store and export information from hacked computers.

4

17.    "PHP script" was a server-side scripting language designed for web development but also used as a general-purpose programming language.   An unauthorized PHP script was an unauthorized program that could run undetected within a hacked server.

18.    "Structured Query Language" ("SQL") was a computer programming language designed to retrieve and manage data stored in computer databases.

19.    "SQL Injection Attacks" were methods of hacking into and gaining unauthorized access to computers connected to the internet.

20.    "Password hashes" were encrypted data strings generated when a password was passed through an encryption algorithm.   Passwords for network accounts were often stored on the network as a password hash as a security measure.

21.    "Brute force attacks" or "bruting" referred to one method for decrypting data.   This method could be used to decrypt a password hash, revealing the unencrypted password.

22.    "Phishing" referred to an attempt to gain unauthorized access to a computer or computers by sending an email that appeared to be a legitimate communication from a trustworthy source, but contained malware or a link to download malware.

23.    "Short-selling" or "selling short" was the selling of a stock that the seller did not own.   When a trader engaged in short-selling he or she was anticipating a decline in the share price.

24.    A "put option" gave the holder of the option the right, but not the obligation, to sell a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a put option anticipated that the price of the underlying security would decrease during a specified amount of time.

25.    A "call option" gave the holder of the option the right, but not the obligation, to purchase a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a call option anticipated that the price of the underlying security would increase during a specified amount of time.

26.    A "Form 8K" was a form that the SEC required publicly-traded companies to use to notify investors of any material event that was important to the company's shareholders.

IV.    The Fraudulent Hacking and Trading Scheme

A.    Overview

27.    In or about and between February 2010 and August 2015, the defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK and ALEXANDER GARKUSHA, together with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, Co-Conspirator 5 and others, engaged in a scheme whereby they executed and caused others to execute securities transactions in the Target Companies based in whole or in part on material, nonpublic information ("MNPI") that was fraudulently obtained through unauthorized attacks on the computer networks of the Victim Newswires.   The defendants, together with others, stole MNPI about the Target Companies, which was in the form of confidential press releases, by using sophisticated intrusion techniques, such as SQL injection and brute force attacks, and then traded in the Target Companies based on the stolen MNPI for substantial financial gain.

28.    The defendants and their co-conspirators were generally organized into three groups: (i) the individuals, including Co-Conspirator 4 and Co-Conspirator 5, who used sophisticated intrusion techniques and stole MNPI from the Victim Newswires' computer networks from overseas locations such as Ukraine and Russia (collectively, the "Hackers"); (ii) the

6

individuals, including the defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK, ALEXANDER GARKUSHA, Co-Conspirator 1 and Co-Conspirator 2, who executed securities transactions based on the stolen MNPI (collectively, the "Traders"); and (iii) the individuals, including Co-Conspirator 3, who communicated and coordinated between the Hackers and Traders (collectively, the "Middlemen").

29.     The MNPI stolen by the Hackers contained information relating to the Target Companies' earnings, gross margins, revenues and other confidential and material financial information.   Thus, the confidential press releases contained economically valuable information and the Victim Newswires and Target Companies had a right to control the use of that information. The Target Companies provided the Victim Newswires with this MNPI, typically in press releases, which was then uploaded on the Victim Newswires' computer networks and disseminated to the public at the direction of the Target Companies.   Until the designated distribution time, the Victim Newswires were contractually bound to keep the content of the press releases confidential and non-public.

30.     The Target Companies' press releases were maintained on the Victim Newswires' computer networks for a limited period of time.   Consequently, the Hackers stole the MNPI shortly after it was uploaded onto the Victim Newswires' computer networks and quickly made the MNPI available to the Traders, initially through the Middlemen, so that the Traders could engage in illegal securities transactions before the MNPI was released to the public (hereinafter referred to as "inside the window trades").   In sum, in or about and between January 2011 and February 2014 alone, the defendants and their co-conspirators stole more than 100,000 press releases and executed approximately 1,000 inside the window trades in the Target Companies

based on MNPI stolen from the Victim Newswires resulting in approximately $30 million in illegal profits.

      B.      <u>The Hacking of the Victim Newswires</u>

      31.     The Hackers, including Co-Conspirator 4 and Co-Conspirator 5, attempted to gain access to the Victim Newswires' computer networks to steal the Target Companies' MNPI using various methods, such as phishing attempts and the surreptitious infiltration of servers the Victim Newswires leased from data storage providers.

      32.     In or about July 2010, the Hackers gained access to PR Newswire through the use of malware.   The Hackers sent unauthorized PHP commands to the PR Newswire servers. Through these and other techniques, the Hackers could access press releases maintained on PR Newswire's network from any internet-connected computer in the world.   Once the Hackers accessed the PHP script, they were able to maneuver freely on PR Newswire's computer network, including accessing the confidential press releases of the Target Companies that used PR Newswire.   Web server logs recovered from the hacked PR Newswire servers show repeated and regular improper accesses to the PR Newswire servers.   On or about October 10, 2012, Co-Conspirator 5 sent a message, in Russian, to an unidentified individual, which stated, "I'm hacking prnewswire.com."   When PR Newswire identified and removed malware that the Hackers had installed on its servers, an IP address associated with Co-Conspirator 4 made several unauthorized attempts to regain access to the PR Newswire servers.

      33.     The Hackers also gained unauthorized access to Business Wire's servers. Co-Conspirator 5's computer contained a file listing user IDs and associated hashed passwords for more than 200 employees of Business Wire.   On or about March 25, 2012, in an internet chat between Co-Conspirator 4 and Co-Conspirator 5, Co-Conspirator 5 stated that he had successfully

"bruted" a number of hashed passwords.  The next day, Co-Conspirator 5 sent Co-Conspirator 4 an electronic communication containing a link to malware that had been placed on Business Wire's computer network.

34.    Beginning in at least February 2010, the Hackers gained unauthorized access to press releases on Marketwired's networks using a series of SQL injection attacks.  For example, on or about and between April 24, 2012 and July 20, 2012, Co-Conspirator 4 sent SQL injection attack commands more than 390 times into Marketwired's computer network and was able to steal more than 900 press releases, including press releases from some of the Target Companies.

C.    Sharing the Stolen MNPI

35.    To execute the fraudulent scheme, the Hackers, Middlemen and Traders worked in concert and shared the fraudulently obtained MNPI from the Victim Newswires through, inter alia, interstate and international emails, telephone calls and internet chats.  For example, a Gmail email account registered to and used by Co-Conspirator 2 exchanged numerous emails with a Gmail email account registered to and used by the defendant VITALY KORCHEVSKY.  On or about April 26, 2013, Co-Conspirator 2 sent an email to KORCHEVSKY instructing him to sell their stock, per Co-Conspirator 1's orders.  In response, KORCHEVSKY stated that they "got the numbers right" but that the market's "reaction [was] mixed."  In fact, around the time of this email exchange, the Traders began trading 12 stocks, specifically, ECHO, EHTH, CAMP, CENX, MCRI, PFPT, IKAN, GDI, ACO, CALX, MCRL and VRSN, with mixed results.

36.    On or about December 18, 2013, the defendant VLADISLAV KHALUPSKY sent an email from his Gmail email account to his Yahoo! email account attaching

9

screenshots of an unreleased native-file version of an Oracle Corporation ("Oracle") Form 8K

containing earnings and other financial information for Oracle.

37. On or about January 3, 2014, Co-Conspirator 3 sent an email to

Co-Conspirator 1 attaching five images displaying information about upcoming unreleased press

releases for U.S. publicly traded companies. On or about January 6, 2014, Co-Conspirator 1

forwarded this email to the defendant ALEXANDER GARKUSHA. These images collectively

contained information about the timing of press releases for more than 100 companies and the

newswire service that would be issuing the press release.

38. In an effort to expand their fraudulent hacking and trading network, the

defendants and their co-conspirators shared information on additional fraudulent schemes and

attempted to recruit new traders and hackers through, inter alia, internet chats and emails. For

example, between January 15, 2013 and January 20, 2013, the defendants VITALY

KORCHEVSKY and VLADISLAV KHALUPSKY exchanged emails with Co-Conspirator 1 and

Co-Conspirator 3 in which they discussed a "proprietary trading business" that involved a "special

daytrading strategy" that "never los[t] money in the twelve months of 2012" and where the

"typical trader" is alleged to make "a profit between $40,000 to $50,000" per month.

D.   Trading on Stolen MNPI

39. The defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY

and LEONID MOMOTOK, together with Co-Conspirator 1 and Co-Conspirator 2, coordinated

their fraudulent inside the window trades. On or about October 8, 2013, Co-Conspirator 3 sent an

email to Co-Conspirator 1 with a blank subject line and attached a photograph of a printout of a

spreadsheet that contained information about 18 U.S. publicly traded companies that were

scheduled to issue press releases concerning earnings and other economically valuable

information in October 2013 (the "Wish List").   On or about October 9, 2013, Co-Conspirator 1 forwarded this email to GARKUSHA.   In October 2013, KORCHEVSKY, MOMOTOK and Co-Conspirator 1 executed inside the window trades on six of the 18 companies listed in spreadsheet, specifically, ALGN, AMD, PNRA, JNPR, VMW and GNTX.

40.   For example, the Wish List indicated that Marketwired would issue the ALGN press release on October 17, 2013.   The press release was uploaded on Marketwired on October 17, 2013 at approximately 1:28 AM and issued to the public later that day at approximately 4:00 PM.   Within this window, Co-Conspirator 1 bought approximately 91,000 shares of ALGN on October 17, 2013, beginning at approximately 12:34 PM.   A little over two hours later, beginning at approximately 2:36 PM, the defendant VITALY KORCHEVSKY bought approximately 95,500 shares of ALGN.   As a result of this inside the window trading in ALGN based on stolen MNPI, KORCHEVSKY and Co-Conspirator 1 made approximately $1.4 million.

41.   As another example, the Wish List indicated that Marketwired would issue the PNRA press release "after market," or after the stock market closed at 4:00 PM on October 22, 2013.   The press release was uploaded on Marketwired on October 22, 2013 at approximately 9:04 AM and issued to the public later that day at approximately 4:05 PM.   Within this window, Co-Conspirator 1 sold short at least 29,000 shares of PNRA on October 22, 2013, beginning at approximately 2:04 PM.   A little over an hour later, but still within the window, the defendant LEONID MOMOTOK bought approximately 1,000 shares, 26,000 call options and 2,000 put options of PNRA, beginning at approximately 3:18 PM.   MOMOTOK was followed by the defendant VITALY KORCHEVSKY who sold short approximately 50,000 shares and purchased 100 put options of PNRA, beginning at approximately 3:21 PM.   As a result of this inside the

11

window trading in PNRA based on stolen MNPI, KORCHEVSKY, MOMOTOK and Co-Conspirator 1 made approximately $950,000.

42.    The timely coordination between the defendants and their co-conspirators was critical to the success of this fraudulent hacking and trading scheme that yielded more than $30 million in illegal proceeds.   For example, on August 3, 2011, the DNDN press release was uploaded on PR Newswire at approximately 3:34 PM and issued to the public less than thirty minutes later at approximately 4:01 PM.   Within this twenty-seven minute window, beginning at approximately 3:56 PM, the defendant VITALY KORCHEVSKY bought 1,100 put options of DNDN.   The next day, KORCHEVSKY sold all 1,100 put options for a profit of more than $2.3 million.   Telephone records revealed that KORCHEVSKY called Co-Conspirator 1's business on August 2, 2011, and again on August 3, 2011, before the DNDN press release was uploaded on PR Newswire.   On August 4, 2011, after KORCHEVSKY sold the put options, KORCHEVSKY placed a call to and received a call from Co-Conspirator 1's business on two occasions.   A few months later, in or about October 2011, through a series of intermediary transactions, KORCHEVSKY used $400,000 from the same brokerage account he used to execute the DNDN trade to purchase real estate in Glen Mills, Pennsylvania.   Later that year, in or about December 2011, KORCHEVSKY used the balance of assets in this same brokerage account to purchase additional real estate.

43.    As another example, on November 7, 2011, the TRAK press release was uploaded to PR Newswire at approximately 11:56 AM and issued to the public later that day at approximately 4:05 PM.   Within the window, beginning at approximately 1:37 PM, the defendant VITALY KORCHEVSKY began buying 66,552 shares of TRAK.   One minute later, beginning at approximately 1:38 PM, Co-Conspirator 1 began buying 94,420 shares of TRAK.   A little over an

hour later, beginning at approximately 3:49 PM, the defendant LEONID MOMOTOK began

buying 5,424 shares of TRAK.   Telephone records revealed that MOMOTOK placed two

telephone calls to Co-Conspirator 1's business at 1:12 PM and 1:13 PM, approximately

twenty-five minutes before Co-Conspirator 1 began trading in TRAK, and received a telephone

call from Co-Conspirator 1's business at 3:34 PM, approximately fifteen minutes before

MOMOTOK began trading in TRAK.   As a result of this inside the window trading in TRAK

based on stolen MNPI, KORCHEVSKY, MOMOTOK and Co-Conspirator 1 made approximately

$540,000.

       44.     In exchange for the stolen MNPI, the Traders paid the Hackers, inter alia, a

percentage of the Traders' profits from their inside the window trades.   To conceal their ties in

this fraudulent scheme, the Traders wired their fraudulent trading proceeds to, inter alia, accounts

in Estonia in the names of shell companies controlled by the Hackers and the Traders.   The

Traders and Hackers also shared access to the same brokerage accounts.   For example, the IP

address associated with Co-Conspirator 4 frequently accessed brokerage accounts controlled by

Co-Conspirator 1 and Co-Conspirator 2 that were used to execute hundreds of inside the window

trades.   Additionally, Co-Conspirator 1 and Co-Conspirator 2 shared login and password

information for brokerage accounts that they controlled with the defendant VLADISLAV

KHALUPSKY and an IP address associated with KHALUPSKY accessed these brokerage

accounts on numerous occasions over the course of the conspiracy.

COUNT ONE
(Conspiracy to Commit Wire Fraud)

       45.     The allegations contained in paragraphs one through forty-four are

realleged and incorporated as if fully set forth in this paragraph.

13

46.     In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK and ALEXANDER GARKUSHA, together with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, Co-Conspirator 5 and others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud the Victim Newswires and the Target Companies, and to obtain money and property from the Victim Newswires and the Target Companies by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Securities Fraud)

47.     The allegations contained in paragraphs one through forty-four are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

48.     In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK and ALEXANDER GARKUSHA, together with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, Co-Conspirator 5 and others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of

Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in the Target Companies, in connection with the purchase and sale of investments in the Target Companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

49.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK and ALEXANDER GARKUSHA, together with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, Co-Conspirator 5 and others, committed and caused to be committed, among others, the following:

OVERT ACTS

a.     On or about November 26, 2010, Co-Conspirator 3 sent an email to GARKUSHA that contained instructions on how to download the hacked press releases.

b.     On or about December 9, 2010, GARKUSHA sent an email to a co-conspirator, an individual whose identity is known to the Grand Jury, containing instructions on how to download the hacked press releases and advising how to conceal one's IP address while viewing the hacked press releases.

c.     On or about May 23, 2012, MOMOTOK bought approximately 3,000 put options of HPQ stock at approximately 3:54 PM, which was between the time that the

press release was uploaded onto PR Newswire's servers and the time that the press release was disclosed to the public.

        d.     On or about January 15, 2013, Co-Conspirator 3 sent an email to KHALUPSKY discussing trading strategies designed to manipulate the price of stocks and stating that traders make "a profit between $40,000 [and] $50,000" a month.

        e.     On or about April 26, 2013, KORCHEVSKY sent an email to Co-Conspirator 2 stating that they "got the numbers right" but that the market's "reaction [was] mixed" in response to instructions to sell the stock.

        f.     On or about December 18, 2013, KHALUPSKY sent an email from his Gmail email account to his Yahoo email account, which was registered in Brooklyn, New York, attaching an unreleased native file version of an Oracle press release.

        (Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT THREE
(Securities Fraud – PR Newswire Hack)

        50.     The allegations contained in paragraphs one through forty-four are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

        51.     In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK and ALEXANDER GARKUSHA, together with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, Co-Conspirator 5 and others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code

16

of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and

artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state

one or more material facts necessary in order to make the statements made, in the light of the

circumstances in which they were made, not misleading; and (c) engaging in one or more acts,

practices and courses of business which would and did operate as a fraud and deceit upon one or

more investors or potential investors in the Target Companies that used PR Newswire, in

connection with the purchases and sales of investments in the Target Companies that used PR

Newswire, directly and indirectly, by use of means and instrumentalities of interstate commerce

and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States

Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
(Securities Fraud – Marketwired Hack)

52.     The allegations contained in paragraphs one through forty-four are hereby

realleged and incorporated by reference as if fully set forth in this paragraph.

53.     In or about and between February 2010 and August 2015, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants

VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK and

ALEXANDER GARKUSHA, together with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator

3, Co-Conspirator 4, Co-Conspirator 5 and others, did knowingly and willfully use and employ

one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the

Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code

of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and

17

artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in the Target Companies that used Marketwired, in connection with the purchases and sales of investments in the Target Companies that used Marketwired, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FIVE
### (Money Laundering Conspiracy)

54.     The allegations contained in paragraphs one through forty-four are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

55.     In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY, VLADISLAV KHALUPSKY, LEONID MOMOTOK and ALEXANDER GARKUSHA, together with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, Co-Conspirator 5 and others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds from one or more places in the United States to one or more places outside the United States, (i) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, and fraud in the sale of securities, in violation of Title 15, United States Code,

Sections 78j(b) and 78ff, contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (ii) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH FOUR

56.     The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One through Four, the United States will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds traceable to such offenses, including but not limited to all right, title and interest in: (a) the real property and premises located at 1591 Meadow Lane, Glen Mills, Pennsylvania 19342;  (b) the real property and premises located at 3 Skyline Drive, Glen Mills, Pennsylvania 19342; (c) the real property and premises located at 7 Skyline Drive, Glen Mills, Pennsylvania 19342; (d) the real property and premises located at 9 Blackhorse Lane, Media, Pennsylvania 19063; (e) the real property and premises located at 316 Willowbrook Road, Upper Chichester, Pennsylvania 19061; (f) the real property and premises located at 674 Cheyney Road, West Chester, Pennsylvania; 19382 (g) the real property and premises located at 1290 Samuel Road, West Chester, Pennsylvania 19380; (h) the real property and premises located at 1737 Graham Road, Macon, Georgia 31211; (i) the real property and premises located at 122-134 Lancaster Avenue, Malvern, Pennsylvania 19355; and (j) the real property and premises located at 1801 East Kings Highway, Coatesville, Pennsylvania 19320.

57.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT FIVE

58.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit all property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to all right, title and interest in: (a) the real property and premises located at 1591 Meadow Lane, Glen Mills, Pennsylvania 19342; (b) the real property and premises located at 3 Skyline Drive, Glen Mills, Pennsylvania 19342; (c) the real property and premises located at 7 Skyline Drive, Glen Mills, Pennsylvania 19342; (d) the real property and

20

premises located at 9 Blackhorse Lane, Media, Pennsylvania 19063; (e) the real property and premises located at 316 Willowbrook Road, Upper Chichester, Pennsylvania 19061; (f) the real property and premises located at 674 Cheyney Road, West Chester, Pennsylvania 19382; (g) the real property and premises located at 1290 Samuel Road, West Chester, Pennsylvania 19380; (h) the real property and premises located at 1737 Graham Road, Macon, Georgia 31211; (i) the real property and premises located at 122-134 Lancaster Avenue, Malvern, Pennsylvania 19355; and (j) the real property and premises located at 1801 East Kings Highway, Coatesville, Pennsylvania 19320.

   59. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

     (a) cannot be located upon the exercise of due diligence;

     (b) has been transferred or sold to, or deposited with, a third party;

     (c) has been placed beyond the jurisdiction of the court;

     (d) has been substantially diminished in value; or

     (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 982(a)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

22

F. #2012R00103
FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*VITALY KORCHEVSKY, et al.,*

Defendants.

## INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1), 1349, 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____

*of* _____ *A.D. 20* _____ *day,*

_____
*Clerk*

*Bail, $* _____

*Christopher A. Ott, Assistant U.S. Attorney (718) 254-6154*

23