WMP:RMT/UAD/JN/BDM
F. #2012R00103

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 13 2016 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

VITALY KORCHEVSKY and
VLADISLAV KHALUPSKY,

                 Defendants.

- - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>15-381 (S-1) (RJD)</u>
(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
  U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1),
  1349, 1956(h), 2 and 3551 <u>et seq</u>.; T. 21,
  U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

      At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    <u>The Defendants and Relevant Co-conspirators</u>

      1.    The defendant VITALY KORCHEVSKY was a resident of Glen Mills,

Pennsylvania, and controlled brokerage accounts at, <u>inter alia</u>, E*Trade, Jefferies, JP Morgan,

Scottrade, Fidelity and TD Ameritrade.   KORCHEVSKY was formerly a hedge fund manager

and investment adviser who was registered with the Securities and Exchange Commission

("SEC") from 2005 through 2009.

      2.    The defendant VLADISLAV KHALUPSKY was a resident of Brooklyn,

New York and Odessa, Ukraine, and controlled brokerage accounts at, <u>inter alia</u>, Merrill Lynch.

KHALUPSKY was formerly a broker-dealer registered with the SEC from 2000 through 2008.

      3.    Leonid Momotok was a resident of Suwanee, Georgia, and controlled

brokerage accounts at, <u>inter alia</u>, TD Ameritrade.

4.      Alexander Garkusha was a resident of Alpharetta and Cumming, Georgia. Garkusha was the Executive Vice President of APD Developers, Inc., a company based in Alpharetta, Georgia, that designed and built residential communities and condominiums.

5.      Arkadiy Dubovoy was a resident of Alpharetta, Georgia, and controlled brokerage accounts at, inter alia, Charles Schwab, E*Trade, Fidelity, Merrill Lynch and TD Ameritrade.   Arkadiy Dubovoy was the owner of APD Developers, Inc.

6.      Igor Dubovoy was a resident of Alpharetta, Georgia, and controlled brokerage accounts at, inter alia, Charles Schwab, E*Trade, Fidelity, Merrill Lynch and TD Ameritrade.   Igor Dubovoy was the son of Arkadiy Dubovoy.

7.      Pavel Dubovoy was a resident of Alpharetta, Georgia and Kiev, Ukraine. Pavel Dubovoy was related to Arkadiy Dubovoy and Igor Dubovoy.

8.      Ivan Turchynov was a resident of Kiev, Ukraine.

9.      Oleksandr Ieremenko was a resident of Kiev, Ukraine.

II.      The Targeted Entities

10.      PR Newswire Association LLC ("PR Newswire"), a wholly-owned subsidiary of UBM plc, was a global company with its headquarters in New York, New York.   PR Newswire was in the business of, inter alia, publishing and disseminating press releases for corporate clients.

11.      Marketwired L.P. ("Marketwired") was a privately-held company with its global headquarters in Toronto, Canada and its U.S. headquarters in El Segundo, California. Marketwired was in the business of, inter alia, publishing and disseminating press releases for corporate clients.

2

12. Business Wire, a wholly-owned subsidiary of Berkshire Hathaway, was a global company with its headquarters in San Francisco, California. Business Wire was in the business of, inter alia, publishing and disseminating press releases for corporate clients.

13. PR Newswire, Marketwired and Business Wire (collectively, the "Victim Newswires") were authorized by the SEC to issue press releases for, inter alia, the following publicly-traded companies: Acme Packet, Inc. ("APKT"); Advanced Micro Devices Inc. ("AMD"); Aéropostale, Inc. ("ARO"); Albemarle Corp. ("ALB"); Align Technology, Inc. ("ALGN"); AllianceBernstein Holding ("AB"); Allscripts Healthcare Solutions ("MDRX"); Allstate Corp. ("ALL"); Altera Corp. ("ALTR"); ANN INC. ("ANN"); Arkansas Best Corp. ("ABFS"); ARRIS Group ("ARRS"); Atmel ("ATML"); AutoNation, Inc. ("AN"); Avista Corp. ("AVA"); Avon Products, Inc. ("AVP"); Bob Evans Farms, Inc. ("BOBE"); The Boeing Company ("BA"); BorgWarner, Inc. ("BWA"); CA, Inc. ("CA"); Calumet Specialty Products Partners ("CLMT"); Caterpillar Inc. ("CAT"); Cepheid ("CPHD"); Chubb Ltd. ("CB"); Clorox Co. ("CL"); Corrections Corp. of America ("CXW"); Covanta Energy Co. ("CVA"); Cyberonics, Inc. ("CYBX"); Cynosure, Inc. ("CYNO"); Darden Restaurants, Inc. ("DRI"); Darling Ingredients, Inc. ("DAR"); DealerTrack Technologies, Inc. ("TRAK"); Dean Foods ("DF"); Deere & Company ("DE"); Dendreon Corp. ("DNDN"); Dick's Sporting Goods, Inc. ("DKS"); DigitalGlobe, Inc. ("DGI"); Domino's Pizza ("DPZ"); DreamWorks Animation ("DWA"); E. I. Du Pont De Nemours and Company ("DD"); Dycom Industries, Inc. ("DY"); Edwards Lifesciences Corporation ("EW"); Extra Space Storage ("EXR"); Foot Locker, Inc. ("FL"); Gentex Corp. ("GNTX"); GeoEye, Inc. ("GEOY"); GNC Holdings, Inc. ("GNC"); Guess?, Inc. ("GES"); The Hain Celestial Group, Inc. ("HAIN"); Hertz Global Holdings, Inc. ("HTZ"); Hewlett-Packard Company ("HPQ"); HNI Corp. ("HNI"); The Home Depot, Inc. ("HD");

3

Hospira, Inc. ("HSP"); InterOil Corp. ("IOC"); Juniper Networks, Inc. ("JNPR"); La-Z-Boy

("LZB"); LDK Solar Co., Ltd. ("LDK"); Legg Mason, Inc. ("LM"); Leggett & Platt, Inc. ("LEG");

MasTec, Inc. ("MTZ"); Lincoln Electric Holdings, Inc. ("LECO"); Lions Gate Entertainment

("LGF"); Marriott International ("MAR"); Micrel Inc. ("MCRL"); MICROS Systems, Inc.

("MCRS"); NetApp, Inc. ("NTAP"); NuVasive, Inc. ("NUVA"); OmniVision Technologies, Inc.

("OVTI"); OMNOVA Solutions Inc. ("OMN"); Oracle Corporation ("ORCL"); Overstock.com,

Inc. ("OSTK"); Owens Corning ("OC"); Panera Bread Company ("PNRA"); PAREXEL

International Corporation ("PRXL"); Parker-Hannifin Corporation ("PH"); Payless ShoeSource

("PSS"); The PNC Financial Services Group, Inc. ("PNC"); Qualcomm, Inc. ("QCOM");

RadioShack Corporation ("RSH"); Silicon Graphics International Corp. ("SGI"); Southwestern

Energy ("SWN"); Stone Energy ("SGY"); Synopsys, Inc. ("SNPS"); Tesla Motors, Inc.

("TSLA"); Texas Instruments Incorporated ("TXN"); TreeHouse Foods, Inc. ("THS"); VASCO

Data Security International, Inc. ("VDSI"); VeriSign, Inc. ("VRSN"); VMware, Inc. ("VMW");

and Weight Watchers International, Inc. ("WTW") (collectively, the "Target Companies").

III.     Relevant Terms and Definitions

          14.     An "Internet Protocol" address ("IP address") was a numerical label

assigned to each device (e.g., computer, printer) participating in a computer network that used the

Internet Protocol for communication.   An IP address served two principal functions: host or

network interface identification and location addressing.   Because every device that connected to

the internet used an IP address, IP address information could identify computers and other devices

that were used to access the internet.

15.     A "Uniform Resource Locator" ("URL") was a computerized reference to a resource that specified the location of the resource on a computer network and a mechanism for retrieving it.   URLs most commonly referenced web pages.

16.     "Malware" referred to malicious computer software programmed to, <u>inter alia</u>, gain and maintain unauthorized access to computers and to identify, store and export information from hacked computers.

17.     "PHP script" was a server-side scripting language designed for web development but also used as a general-purpose programming language.   An unauthorized PHP script was an unauthorized program that could run undetected within a hacked server.

18.     "Structured Query Language" ("SQL") was a computer programming language designed to retrieve and manage data stored in computer databases.

19.     "SQL Injection Attacks" were methods of hacking into and gaining unauthorized access to computers connected to the internet.

20.     "Password hashes" were encrypted data strings generated when a password was passed through an encryption algorithm.   Passwords for network accounts were often stored on the network as a password hash as a security measure.

21.     "Brute force attacks" or "bruting" referred to one method for decrypting data.   This method could be used to decrypt a password hash, revealing the unencrypted password.

22.     "Phishing" referred to an attempt to gain unauthorized access to a computer or computers by sending an email that appeared to be a legitimate communication from a trustworthy source, but contained malware or a link to download malware.

23.    "Short-selling" or "selling short" was the selling of a stock that the seller did not own.   When a trader engaged in short-selling he or she was anticipating a decline in the share price.

24.    A "put option" gave the holder of the option the right, but not the obligation, to sell a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a put option anticipated that the price of the underlying security would decrease during a specified amount of time.

25.    A "call option" gave the holder of the option the right, but not the obligation, to purchase a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a call option anticipated that the price of the underlying security would increase during a specified amount of time.

26.    A "Form 8K" was a form that the SEC required publicly-traded companies to use to notify investors of any material event that was important to the company's shareholders.

IV.    The Fraudulent Hacking and Trading Scheme

A.    Overview

27.    In or about and between February 2010 and August 2015, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok, Alexander Garkusha, Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Ivan Turchynov, Oleksandr Ieremenko and others, engaged in a scheme whereby they executed and caused others to execute securities transactions in the Target Companies based in whole or in part on material, nonpublic information ("MNPI") that was fraudulently obtained through unauthorized attacks on the computer networks of the Victim Newswires.   The defendants, together with others, stole MNPI about the Target Companies, which was in the form of confidential press releases, by using

6

sophisticated intrusion techniques, such as SQL injection and brute force attacks, and then traded in the Target Companies based on the stolen MNPI for substantial financial gain.

28.     The defendants and their co-conspirators were generally organized into three groups: (i) the individuals, including Ivan Turchynov and Oleksandr Ieremenko, who used sophisticated intrusion techniques and stole MNPI from the Victim Newswires' computer networks from overseas locations such as Ukraine and Russia (collectively, the "Hackers"); (ii) the individuals, including the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, Leonid Momotok, Alexander Garkusha, Arkadiy Dubovoy and Igor Dubovoy, who executed securities transactions based on the stolen MNPI (collectively, the "Traders"); and (iii) the individuals, including Pavel Dubovoy, who communicated and coordinated between the Hackers and Traders (collectively, the "Middlemen").

29.     The MNPI stolen by the Hackers contained information relating to the Target Companies' earnings, gross margins, revenues and other confidential and material financial information.  Thus, the confidential press releases contained economically valuable information and the Victim Newswires and Target Companies had a right to control the use of that information. The Target Companies provided the Victim Newswires with this MNPI, typically in press releases, which was then uploaded on the Victim Newswires' computer networks and disseminated to the public at the direction of the Target Companies.  Until the designated distribution time, the Victim Newswires were contractually bound to keep the content of the press releases confidential and non-public.

30.     The Target Companies' press releases were maintained on the Victim Newswires' computer networks for a limited period of time.  Consequently, the Hackers stole the MNPI shortly after it was uploaded onto the Victim Newswires' computer networks and quickly

7

made the MNPI available to the Traders, initially through the Middlemen, so that the Traders could engage in illegal securities transactions before the MNPI was released to the public (hereinafter referred to as "inside the window trades").   In sum, in or about and between January 2011 and February 2014 alone, the defendants and their co-conspirators stole more than 100,000 press releases and executed approximately 1,000 inside the window trades in the Target Companies based on MNPI stolen from the Victim Newswires resulting in approximately $30 million in illegal profits.

        B.      <u>The Hacking of the Victim Newswires</u>

        31.     The Hackers, including Ivan Turchynov and Oleksandr Ieremenko, attempted to gain access to the Victim Newswires' computer networks to steal the Target Companies' MNPI using various methods, such as phishing attempts and the surreptitious infiltration of servers the Victim Newswires leased from data storage providers.

        32.     In or about July 2010, the Hackers gained access to PR Newswire through the use of malware.   The Hackers sent unauthorized PHP commands to the PR Newswire servers. Through these and other techniques, the Hackers could access press releases maintained on PR Newswire's network from any internet-connected computer in the world. Web server logs recovered from the hacked PR Newswire servers show repeated and regular improper accesses to the PR Newswire servers.   On or about October 10, 2012, Oleksandr Ieremenko sent a message, in Russian, to an unidentified individual, which stated, "I'm hacking prnewswire.com."   When PR Newswire identified and removed malware that the Hackers had installed on its servers, an IP address associated with Ivan Turchynov made several unauthorized attempts to regain access to the PR Newswire servers.

33.     The Hackers also gained unauthorized access to Business Wire's servers. Oleksandr Ieremenko's computer contained a file listing user IDs and associated hashed passwords for more than 200 employees of Business Wire.   On or about March 25, 2012, in an internet chat between Ivan Turchynov and Ieremenko, Ieremenko stated that he had successfully "bruted" a number of hashed passwords.   The next day, Ieremenko sent Turchynov an electronic communication containing a link to malware that had been placed on Business Wire's computer network.

34.     Beginning in at least February 2010, the Hackers gained unauthorized access to press releases on Marketwired's networks using a series of SQL injection attacks.   For example, on or about and between April 24, 2012 and July 20, 2012, Ivan Turchynov sent SQL injection attack commands more than 390 times into Marketwired's computer network and was able to steal more than 900 press releases, including press releases from some of the Target Companies.

C.     Sharing the Stolen MNPI

35.     To execute the fraudulent scheme, the Hackers, Middlemen and Traders worked in concert and shared the fraudulently obtained MNPI from the Victim Newswires through, inter alia, interstate and international emails, telephone calls and internet chats.   For example, a Gmail email account registered to and used by Igor Dubovoy exchanged numerous emails with a Gmail email account registered to and used by the defendant VITALY KORCHEVSKY.   On or about April 26, 2013, Igor Dubovoy sent an email to KORCHEVSKY instructing him to sell their stock, per Arkadiy Dubovoy's orders.   In response, KORCHEVSKY stated that they "got the numbers right" but that the market's "reaction [was] mixed."   In fact, around the time of this email exchange, the Traders began trading 12 stocks, specifically, ECHO,

9

EHTH, CAMP, CENX, MCRI, PFPT, IKAN, GDI, ACO, CALX, MCRL and VRSN, with mixed results.

36.     On or about December 18, 2013, the defendant VLADISLAV KHALUPSKY sent an email from his Gmail email account to his Yahoo! email account attaching screenshots of an unreleased native-file version of an Oracle Corporation ("Oracle") Form 8K containing earnings and other financial information for Oracle.

37.     On or about January 3, 2014, Pavel Dubovoy sent an email to Arkadiy Dubovoy attaching five images displaying information about upcoming unreleased press releases for U.S. publicly-traded companies.   On or about January 6, 2014, Arkadiy Dubovoy forwarded this email to Alexander Garkusha.   These images collectively contained information about the timing of press releases for more than 100 companies and the newswire service that would be issuing the press release.

38.     In an effort to expand their fraudulent hacking and trading network, the defendants and their co-conspirators shared information on additional fraudulent schemes and attempted to recruit new traders and hackers through, inter alia, internet chats and emails.   For example, between January 15, 2013 and January 20, 2013, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY exchanged emails with Arkadiy Dubovoy and Pavel Dubovoy in which they discussed a "proprietary trading business" that involved a "special daytrading strategy" that "never los[t] money in the twelve months of 2012" and where the "typical trader" is alleged to make "a profit between $40,000 to $50,000" per month.

D.     Trading on Stolen MNPI

39.     The defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok, Alexander Garkusha, Arkadiy Dubovoy, Igor

Dubovoy and others, coordinated their fraudulent inside the window trades.   On or about October 8, 2013, Pavel Dubovoy sent an email to Arkadiy Dubovoy with a blank subject line and attached a photograph of a printout of a spreadsheet that contained information about 18 U.S. publicly-traded companies that were scheduled to issue press releases concerning earnings and other economically valuable information in October 2013 (the "Wish List").   On or about October 9, 2013, Arkadiy Dubovoy forwarded this email to Garkusha.   In October 2013, KORCHEVSKY, Momotok and Arkadiy Dubovoy executed inside the window trades on six of the 18 companies listed in spreadsheet, specifically, ALGN, AMD, PNRA, JNPR, VMW and GNTX.

40.     For example, the Wish List indicated that Marketwired would issue the ALGN press release on October 17, 2013.   The press release was uploaded on Marketwired on October 17, 2013 at approximately 1:28 AM and issued to the public later that day at approximately 4:00 PM.   Within this window, Arkadiy Dubovoy bought approximately 91,000 shares of ALGN on October 17, 2013, beginning at approximately 12:34 PM.   A little over two hours later, beginning at approximately 2:36 PM, the defendant VITALY KORCHEVSKY bought approximately 95,500 shares of ALGN.   As a result of this inside the window trading in ALGN based on stolen MNPI, KORCHEVSKY and Arkadiy Dubovoy made approximately $1.4 million.

41.     As another example, the Wish List indicated that Marketwired would issue the PNRA press release "after market," or after the stock market closed at 4:00 PM on October 22, 2013.   The press release was uploaded on Marketwired on October 22, 2013 at approximately 9:04 AM and issued to the public later that day at approximately 4:05 PM.   Within this window, Arkadiy Dubovoy sold short at least 29,000 shares of PNRA on October 22, 2013, beginning at approximately 2:04 PM.   A little over an hour later, but still within the window, Leonid Momotok

11

bought approximately 1,000 shares, 26,000 call options and 2,000 put options of PNRA, beginning at approximately 3:18 PM.   Momotok was followed by the defendant VITALY KORCHEVSKY who sold short approximately 50,000 shares and purchased 100 put options of PNRA, beginning at approximately 3:21 PM.   As a result of this inside the window trading in PNRA based on stolen MNPI, KORCHEVSKY, Momotok and Arkadiy Dubovoy made approximately $950,000.

42.     The timely coordination between the defendants and their co-conspirators was critical to the success of this fraudulent hacking and trading scheme that yielded more than $30 million in illegal proceeds.   For example, on August 3, 2011, the DNDN press release was uploaded on PR Newswire at approximately 3:34 PM and issued to the public less than thirty minutes later at approximately 4:01 PM.   Within this 27-minute window, beginning at approximately 3:56 PM, the defendant VITALY KORCHEVSKY bought 1,100 put options of DNDN.   The next day, KORCHEVSKY sold all 1,100 put options for a profit of more than $2.3 million.   Telephone records revealed that KORCHEVSKY called Arkadiy Dubovoy's business on August 2, 2011, and again on August 3, 2011, before the DNDN press release was uploaded on PR Newswire.   On August 4, 2011, after KORCHEVSKY sold the put options, KORCHEVSKY placed a call to and received a call from Arkadiy Dubovoy's business on two occasions.   A few months later, in or about October 2011, through a series of intermediary transactions, KORCHEVSKY used $400,000 from the same brokerage account he used to execute the DNDN trade to purchase real estate in Glen Mills, Pennsylvania.   Later that year, in or about December 2011, KORCHEVSKY used the balance of assets in this same brokerage account to purchase additional real estate.

43.     As another example, on November 7, 2011, the TRAK press release was uploaded to PR Newswire at approximately 11:56 AM and issued to the public later that day at

approximately 4:05 PM.   Within the window, beginning at approximately 1:37 PM, the defendant

VITALY KORCHEVSKY began buying 66,552 shares of TRAK.   One minute later, beginning at

approximately 1:38 PM, Arkadiy Dubovoy began buying 94,420 shares of TRAK.   A little over

an hour later, beginning at approximately 3:49 PM, Leonid Momotok began buying 5,424 shares

of TRAK.   Telephone records revealed that Momotok placed two telephone calls to Arkadiy

Dubovoy's business at 1:12 PM and 1:13 PM, approximately 25 minutes before Arkadiy Dubovoy

began trading in TRAK, and received a telephone call from Arkadiy Dubovoy's business at 3:34

PM, approximately 15 minutes before Momotok began trading in TRAK.   As a result of this

inside the window trading in TRAK based on stolen MNPI, KORCHEVSKY, Momotok and

Arkadiy Dubovoy made approximately $540,000.

44.   In exchange for the stolen MNPI, the Traders paid the Hackers, inter alia, a

percentage of the Traders' profits from their inside the window trades.   To conceal their ties in

this fraudulent scheme, the Traders wired their fraudulent trading proceeds to, inter alia, accounts

in Estonia in the names of shell companies controlled by the Hackers and the Traders.   The

Traders and Hackers also shared access to the same brokerage accounts.   For example, the IP

address associated with Ivan Turchynov frequently accessed brokerage accounts controlled by

Arkadiy Dubovoy and Igor Dubovoy that were used to execute hundreds of inside the window

trades.   Additionally, Arkadiy Dubovoy and Igor Dubovoy shared login and password

information for brokerage accounts that they controlled with the defendant VLADISLAV

KHALUPSKY and an IP address associated with KHALUPSKY accessed these brokerage

accounts on numerous occasions over the course of the conspiracy.

13

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

45.    The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

46.    In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok, Alexander Garkusha, Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Ivan Turchynov, Oleksandr Ieremenko and others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud the Victim Newswires and the Target Companies, and to obtain money and property from the Victim Newswires and the Target Companies by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Conspiracy to Commit Securities Fraud and Computer Intrusions)

47.    The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

48.    In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok,

14

Alexander Garkusha, Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Ivan Turchynov, Oleksandr Ieremenko and others, did knowingly and willfully conspire to:

(a) use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in the Target Companies, in connection with the purchase and sale of investments in the Target Companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff; and

(b) access one or more computers without authorization and exceed authorized access, and thereby to obtain information from one or more protected computers for the purpose of commercial advantage and private financial gain, and in furtherance of criminal and tortious acts in violation of the laws of the United States and any State, and the value of the information obtained exceeded $5,000, contrary to Title 18, United States Code, Sections 1030(a)(2), 1030(b), 1030(c)(2)(A) and 1030(c)(2)(B).

49.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok. Alexander Garkusha, Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Ivan Turchynov, Oleksandr Ieremenko and others, committed and caused to be committed, among others, the following:

## OVERT ACTS

a.      On or about November 26, 2010, Pavel Dubovoy sent an email to Garkusha that contained instructions on how to download the hacked press releases.

b.      On or about December 9, 2010, Garkusha sent an email to a co-conspirator, an individual whose identity is known to the Grand Jury, containing instructions on how to download the hacked press releases and advising how to conceal one's IP address while viewing the hacked press releases.

c.      On or about May 23, 2012, Momotok bought approximately 3,000 put options of HPQ stock at approximately 3:54 PM, which was between the time that the press release was uploaded onto PR Newswire's servers and the time that the related press release was disclosed to the public.

d.      On or about January 15, 2013, Pavel Dubovoy sent an email to KHALUPSKY discussing trading strategies designed to manipulate the price of stocks and stating that traders make "a profit between $40,000 [and] $50,000" a month.

e.      On or about April 26, 2013, KORCHEVSKY sent an email to Igor Dubovoy stating that they "got the numbers right" but that the market's "reaction [was] mixed" in response to instructions to sell the stock.

f.      On or about December 18, 2013, KHALUPSKY sent an email from his Gmail email account to his Yahoo! email account, which was registered in Brooklyn, New York, attaching an unreleased native file version of an Oracle press release.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

16

## COUNT THREE
### (Securities Fraud – PR Newswire Hack)

50.     The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

51.     In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok, Alexander Garkusha, Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Ivan Turchynov, Oleksandr Ieremenko and others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in the Target Companies that used PR Newswire, in connection with the purchases and sales of investments in the Target Companies that used PR Newswire, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
(Securities Fraud – Marketwired Hack)

52. The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

53. In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok, Alexander Garkusha, Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Ivan Turchynov, Oleksandr Ieremenko and others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors or potential investors in the Target Companies that used Marketwired, in connection with the purchases and sales of investments in the Target Companies that used Marketwired, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

18

## COUNT FIVE
(Money Laundering Conspiracy)

54.     The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

55.     In or about and between February 2010 and August 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants VITALY KORCHEVSKY and VLADISLAV KHALUPSKY, together with Leonid Momotok, Alexander Garkusha, Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Ivan Turchynov, Oleksandr Ieremenko and others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds from one or more places in the United States to one or more places outside the United States, and from one or more places outside the United States to and through one or more places in the United States, (i) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, and fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff (the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (ii) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATIONS
AS TO COUNTS ONE THROUGH FOUR

56.     The United States hereby gives notice to the defendants that, upon their
conviction of any of the offenses charged in Counts One through Four, the United States will seek
forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28,
United States Code, Section 2461(c), which require any person convicted of such offenses to
forfeit any property, real or personal, constituting or derived from proceeds traceable to such
offenses, including but not limited to all right, title and interest in: (a) the real property and
premises located at 1591 Meadow Lane, Glen Mills, Pennsylvania 19342;  (b) the real property
and premises located at 3 Skyline Drive, Glen Mills, Pennsylvania 19342; (c) the real property and
premises located at 7 Skyline Drive, Glen Mills, Pennsylvania 19342; (d) the real property and
premises located at 9 Blackhorse Lane, Media, Pennsylvania 19063; (e) the real property and
premises located at 316 Willowbrook Road, Upper Chichester, Pennsylvania 19061; (f) the real
property and premises located at 674 Cheyney Road, West Chester, Pennsylvania; 19382 (g) the
real property and premises located at 1290 Samuel Road, West Chester, Pennsylvania 19380; (h)
the real property and premises located at 1737 Graham Road, Macon, Georgia 31211; (i) the real
property and premises located at 122-134 Lancaster Avenue, Malvern, Pennsylvania 19355; and
(j) the real property and premises located at 1801 East Kings Highway, Coatesville, Pennsylvania
19320.

57.     If any of the above-described forfeitable property, as a result of any act or
omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

20

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT FIVE

58.   The United States hereby gives notice to the defendants that, upon their

conviction of the offense charged in Count Five, the government will seek forfeiture in accordance

with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such

offense to forfeit all property, real or personal, involved in such offense, or any property traceable

to such property, including but not limited to all right, title and interest in: (a) the real property and

premises located at 1591 Meadow Lane, Glen Mills, Pennsylvania 19342; (b) the real property and

premises located at 3 Skyline Drive, Glen Mills, Pennsylvania 19342; (c) the real property and

premises located at 7 Skyline Drive, Glen Mills, Pennsylvania 19342; (d) the real property and

premises located at 9 Blackhorse Lane, Media, Pennsylvania 19063; (e) the real property and

premises located at 316 Willowbrook Road, Upper Chichester, Pennsylvania 19061; (f) the real

property and premises located at 674 Cheyney Road, West Chester, Pennsylvania 19382; (g) the

real property and premises located at 1290 Samuel Road, West Chester, Pennsylvania 19380; (h)

21

the real property and premises located at 1737 Graham Road, Macon, Georgia 31211; (i) the real

property and premises located at 122-134 Lancaster Avenue, Malvern, Pennsylvania 19355; and

(j) the real property and premises located at 1801 East Kings Highway, Coatesville, Pennsylvania

19320.

    59.  If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

       (a)  cannot be located upon the exercise of due diligence;

       (b)  has been transferred or sold to, or deposited with, a third party;

       (c)  has been placed beyond the jurisdiction of the court;

       (d)  has been substantially diminished in value; or

       (e)  has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 982(a)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:_____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

F. #2012R00103
FORM DBD-34
JUN. 85

No. 15 CR 381 (S-1) (RJD)

## UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*VITALY KORCHEVSKY, et al.,*

Defendants.

## SUPERSEDING INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1), 1349, 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                                                      *Foreperson*

*Filed in open court this* _____ *day,*
*of* _____ *A.D. 20* _____

_____
                                                                                            *Clerk*

*Bail, $* _____

_____

***Richard M. Tucker, Una A. Dean and Julia Nestor, Assistant U.S. Attorneys (718) 254-7000***

24