

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RMT/JN/DG                                   *271 Cadman Plaza East*
F.#2012R00103                               *Brooklyn, New York 11201*

October 22, 2018

By Hand and ECF

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Vladislav Khalupsky
              Criminal Docket No. 15-381 (S-1) (RJD)

Dear Judge Dearie:

      On July 6, 2018, a jury returned a guilty verdict against the defendant Vladislav Khalupsky (the "defendant" or "Khalupsky") on all five counts of the superseding indictment, charging the defendant and his co-defendants with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One), conspiracy to commit securities fraud and computer intrusions, in violation of 18 U.S.C. § 371 (Count Two), two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Counts Three and Four) and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).  The charges stemmed from a conspiracy to steal thousands of press releases before they were distributed to the public, and to trade ahead of the market on the information those press releases contained.  The government respectfully submits this letter in advance of sentencing in the above-captioned matter, which is currently scheduled for November 7, 2018.  For the reasons set forth below, the government recommends that the Court impose a sentence within the applicable Guidelines range of 135-168 months' imprisonment.

      I.      <u>Factual Background</u>[1]

      Khalupsky became involved in the conspiracy when Pavel Dubovoy introduced him to Arkadiy Dubovoy in Odessa, Ukraine in the first part of 2011.  <u>See</u> Trial Transcript

---

[1] Because the Court is deeply familiar with the facts of this case from, among other things, presiding over the trial and the party's submissions pre-trial, the government provides only a brief summary of the facts below, and respectfully refers to the trial record and the Presentence Investigation Report ("PSR") for further detail.

("Tr.") at 1525.  At that time, Arkadiy and Pavel Dubovoy told Khalupsky, in sum and substance, that they were able to obtain press releases before the rest of the market.  Tr. at 1526.  The Dubovoys were seeking the defendant's expertise to trade on those press releases.  The Dubovoys needed the defendant because he was an experienced trader who owned a trading business in the Ukraine called Dolphin Trading ("Dolphin").  PSR ¶ 45.  Khalupsky was also a former broker-dealer in the United States and was registered with the SEC from 2000 to 2008.[2]  Id. at ¶ 23.  At the time Pavel Dubovoy introduced Arkadiy Dubovoy to Khalupsky, Arkadiy was already working with Vitaly Korchevsky, another experienced trader living in Pennsylvania.  Id. at ¶ 45.  Arkadiy Dubovoy was periodically dissatisfied with Korchevsky's trading performance and, at Pavel's suggestion, Arkadiy decided to recruit Khalupsky.  Id.

Shortly after Arkadiy Dubovoy met the defendant, Khalupsky started trading in the Dubovoys' accounts using the stolen press releases.  Arkadiy Dubovoy provided Khalupsky with his account access information so Khalupsky and others at Dolphin – at Khalupsky's direction – could trade directly in these accounts.  See, e.g., Tr. at 1526-27, 1745-46.  Khalupsky was successful at trading on the stolen press releases, which required knowledge of the financial markets and fast interpretation of the press releases, and on several occasions, Khalupsky was more successful than Korchevsky.  PSR ¶ 45.  In August 2011, Khalupsky drafted an agreement at Arkadiy Dubovoy's request indicating that Arkadiy granted Khalupsky access to trade in Arkadiy's accounts.  Tr. 1529-37; GX 805.

Internet Protocol ("IP") evidence introduced during trial showed that Khalupsky accessed or traded in accounts in the names of both Igor and Arkadiy Dubovoy from on or about July 2011 to on or about March 2014.  See GX 6001-1.  While the government highlighted two particular accounts that Khalupsky accessed based on IP data and email correspondence, the IP data indicated that the same Khalupsky IP accessed several other Dubovoy accounts as well.  Id.  The trial evidence further showed that once Khalupsky stopped accessing the Dubovoys' accounts because Arkadiy Dubovoy lost access to the press releases, Khalupsky obtained similar stolen information from another source, and Khalupsky continued trading on the illegal information for Arkadiy, but not in Arkadiy's brokerage accounts.  See Tr. 1601-1606, 1768-71.

During the course of the conspiracy, Khalupsky received more than $700,000 from the Dubovoys.  See GX 705.  The money transfers were made to different accounts at different banks outside the Ukraine (and not ones in the name of Dolphin) to avoid detection, including an account in the name of SK Inter Trading LLP and another in the name of Carese Trade & Invest Limited.  Id.  While trial testimony established that $200,000 of the more than $700,000 was for a never-realized partial purchase of Dolphin by Arkadiy Dubovoy, Arkadiy testified that the remainder of his payments to Khalupsky were for the illegal scheme.

---

[2] Khalupsky took several exams that demonstrated his knowledge of the securities markets and related regulators, including the Series 7 exam.  See Government Exhibit ("GX") 814 (Khalupsky FINRA CRD report); Tr. 1447-48 (testimony of Thomas Carocci).

II.    Guidelines

The government recommends that the Court adopt the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§§ 2S1.1(a)(1), 2B1.1) | 31 |
| Plus: Defendant convicted under 18 U.S.C. § 1956 (§2S1.1(b)(2)(B)) | +2 |
| Total: | <u>33</u> |

As stated above, the Base Offense Level is determined by referenced to § 2B1.1 and reflects the following calculations:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus: Gain of more than $3,500,000 (§ 2B1.1(b)(1)(J)) | +18 |
| Plus: Ten or more victims ((§2B1.1(b)(2)(A)(i)) | +2 |
| Plus: Substantial part of scheme committed from outside of United States ((§2B1.1(b)(10)(B)) | +2 |
| Plus: Defendant convicted under 18 U.S.C. § 1030 and offense involved intent to obtain personal information | +2 |
| Total: | <u>31</u> |

Because the defendant is in criminal history category I, the applicable Guidelines range is 135-168 months' imprisonment. This Guidelines calculation is the same as that set forth in the October 19, 2018 Addendum to the Presentence Report.

The defendant asserted a number of objections to the Guidelines calculations. We address these objections below.

A.    Loss Amount

The defendant contends that the total unlawful gain for purposes of his Guidelines calculation should be $3,310,676 – the net profits in the TD Ameritrade and Merrill Lynch accounts. Defendant's Letter Objecting to the PSR ("Def. Ltr.") ¶ 14. As the government discussed in its response letter, dated October 16, 2018, ("Gov. Ltr."), the defendant is incorrect. First, the defendant's calculation of $3.3 million does not reflect the unlawful gain in the two brokerage accounts he cites (TD Ameritrade and Merrill Lynch), but rather the net profits in those accounts. See GX 8004-8005. In other words, in claiming that his total unlawful gain was $3.3 million, the defendant deducts all of his losses resulting from illegal trades. These losses should not be deducted in determining unlawful gain under the Guidelines. See, e.g., United States v. Goffer, 721 F.3d 113, 130 (2d Cir. 2013) (rejecting argument that district court erred by

not deducting losses resulting from trades based on inside information and noting "[w]e find no precedent indicating that additional illegal trades made on material nonpublic information that result in losses should mitigate the sentences of insider traders."); U.S.S.G. § 2B1.4, comment (gain resulting from insider trading is the "total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information").[3]  Without deducting losses resulting from illegal trades, the unlawful gain in just the two accounts cited by the defendant is well over the $3.5 million threshold for an enhancement under U.S.S.G. § 2B1.1(b)(1)(J).  See GX 8002.[4]

Moreover, the trial evidence established that it was reasonably foreseeable to Khalupsky that the conspiracy would result in unlawful gains beyond the nearly $5 million in gains in the TD Ameritrade and Merrill Lynch accounts.  For example, in September 2013, Khalupsky received an email from Pychnenko attaching a brokerage statement reflecting trades in two of the same stocks (FNSR and TIBX) that Khalupsky had made in the Dubovoy Merrill Lynch account on the same day.  See GX 360-360a-1; GX 8002.  The trades in the account statement sent by Pychnenko resulted in profits of approximately $43,000.  See id.  In response to Pychnenko's email, Khalupsky sent Pychnenko bank account information for an account at Loyal Bank in St. Vincent and the Grenadines.  See GX 361. In addition, the trial evidence established that Khalupsky had access to and traded in additional Dubovoy brokerage accounts (see GX 6001-1); knew the hackers (see Tr. 2167); received a $160,000 payment from a Latvian bank account in the name of an entity (Tanigold Assets) controlled by Pavel Dubovoy during the time period in which Khalupsky was illegally trading for the Dubovoys (see GX 258-a1, GX 705); told Arkadiy Dubovoy that, after the Dubovoys lost access to the stolen press releases, he was able to obtain stolen information from another source (see Tr. 1601-1606, 1768-71); and was directly in contact with the Dubovoys, Pychnenko and "Positive1" (Roma).  Given these facts, it was reasonably foreseeable that a potential result of the conspiracy was that the conspirators would gain well more than the $4.7 million in the two Dubovoy accounts in which Khalupsky primarily traded.[5]  And, in fact, they did: the trial evidence established more than $30 million in

---

[3] As the Second Circuit stated in Goffer, "[i]f two defendants are identical save that Defendant A engaged in one more insider trade than Defendant B, there is no case in which Defendant A deserves a lesser punishment than Defendant B.  That Defendant A's additional criminal activity backfired does not affect that calculus."  Goffer, 721 F.3d at 130.  See also United States v. Conner, 217 Fed. Appx. 28, at *1 (2d Cir. 2007) (summary order) ("The district court did not err by not deducting losses stemming from certain trades within the insider-trading scheme from the profits made on other trades to arrive at the amount of gain.").

[4] The sum of profitable trades in the TD Ameritrade account between September 2011 and February 2012 that were (i) in the window and (ii) roundtrips of three days or less is $3.85 million.  See GX 8002.  Applying the same parameters, the sum of profitable trades in the Merrill Lynch account between January 2013 and March 2014 is approximately $884,605.  Id.  Thus, the total gain in those two accounts is $4.7 million.

[5] The Dubovoys gained approximately $7.1 million in trades in addition to the above-referenced trades in the TD Ameritrade and Merrill Lynch Accounts.  See GX 8002.  If Khalupsky were accountable for those additional Dubovoy trades, his gain amount would exceed

gains.  See GX 8002.  Nevertheless, the government seeks a conservative enhancement of a gain between $3.5 million and $9.5 million, an amount that reflects the unlawful gains resulting from Khalupsky's own trades.

### B.    Number of Victims

Under U.S.S.G. § 2B1.1, a victim is defined, in part, as "any person who sustained any part of the actual loss determined under [§ 2B1.1 (b)(1)]."  U.S.S.G. § 2B1.1, Application Note 1.  Where, as here, gain is used as an alternative measure of loss, an "actual loss" determination for Guidelines purposes is necessarily made.  See U.S. v. Romano, 794 F.3d 317, 339 (2d Cir. 2015); cf. U.S.S.G. §2B1.1, Application Note 3(B) (describing gains as "alternative measure of loss if there is a loss but it cannot reasonably be determined"); § 2B1.4, Background (noting that, in insider trading cases, gain "is employed instead of the victims' losses" because "victims and their losses are difficult if not impossible to identify.").  Here, for Guidelines purposes, the victims of the defendant's offenses include the newswires and the companies whose stock the defendant and his co-conspirators traded based on stolen information, and the investors in those companies.  Cf. United States v. O'Hagan, 521 U.S. 642, 643 (1997) (trading based on material nonpublic information harms "members of the investing public"); United States v. Martoma, 2014 WL 4384143, at *7 (S.D.N.Y. Sept. 4, 2014) (investors are victims when defendant trades based on material nonpublic information). [6]  The trial record established hundreds of fraudulent trades in the accounts in which Khalupsky traded, all of which had counterparties on the opposite end.

### C.    Substantial Part of the Scheme Committed Outside the United States

The defendant contends that the enhancement for a "substantial part" of the scheme being committed outside of the United States (U.S.S.G. § 2B1.1(b)(2)(10)(B)) does not apply because the information that was stolen was located in the United States and the trades were made in U.S. accounts.  Def. Ltr. ¶ 14.  The defendant is incorrect because, among other things, the trial evidence showed that the hacks were initiated from abroad; Khalupsky's illegal trades were made from abroad; and millions of dollars of unlawful proceeds were laundered to bank accounts all over the world.[7]  This is the core of the conduct that underlies each of the offenses for which the defendant was convicted: hacking, trading and laundering the proceeds of the hacking and trading scheme.  Moreover, numerous members of the conspiracy – including the hackers, Roma, Pavel Dubovoy, Pychnenko and Khalupsky – committed their offenses from abroad and had meetings in furtherance of the conspiracy abroad.  In sum, the trial evidence

---

the $9.5 million threshold under the Guidelines (without accounting for the gains of Korchevsky or other co-conspirators).

[6] But see United States v. Gupta, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012) (stating that marketplace is not the victim of insider trading).

[7] Although the defendant states that the "profits were paid in the United States," the evidence at trial showed payments made to Khalupsky and others at bank accounts outside of the United States.

clearly established that a substantial portion of the scheme was committed from outside the United States.[8]

D.    Conviction Under 18. U.S.C. § 1030

The defendant contends that the enhancement for being convicted of an offense under 18 U.S.C. § 1030 (U.S.S.G. § 2B1.1(b)(17)(A)) does not apply because the defendant was convicted of conspiring to violate 18 U.S.C. § 1030, in violation of 18 U.S.C. § 371.  Def. Ltr. ¶ 14.  The defendant is incorrect because "[u]nless otherwise specified, an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy . . . in respect to that particular statute."  U.S.S.G. § 1B1.3, note 7.  Thus, because Khalupsky was convicted of conspiring to violate 18 U.S.C. § 1030, the enhancement for being "convicted of an offense under 18 U.S.C. § 1030" applies.  See United States v. Ugoh, 537 Fed. Appx. 126, 129 (3d Cir. 2013) (finding "no ambiguity" in Guidelines and affirming application of enhancement for conviction under 18 U.S.C. §1956 where defendant was convicted of conspiracy to violate 18 U.S.C. § 1956, in violation of 18 U.S.C. § 371).

The defendant further argues that the enhancement does not apply because he was not aware of the methods used by the hackers and it was not reasonably foreseeable to him that the computer intrusions involved an intent to obtain personal information.  Def. Ltr. ¶ 14.  The defendant is incorrect because, given the complexity and scale of the scheme, the defendant's admitted knowledge of the hackers (see Tr. 2167), the length of time during which the defendant was involved in the conspiracy, and the lengths to which the hackers went to gain and regain access to the newswires, it was reasonably foreseeable that such a massive and sophisticated hacking scheme would involve an intent to obtain personal information (namely, information related to numerous employees of the hacked newswires).

III.    The Appropriate Sentence

Contrary to the defendant's assertions, given the seriousness of the conduct here, the scope of the offense and the defendant's role in the offense, a sentence of probation is insufficient to provide just punishment, to promote respect for the law and effect adequate deterrence.  Indeed, for the reasons set forth below, the government respectfully recommends a sentence within the applicable advisory Guidelines range.

A.    The Defendant's Gain Was Substantial And His Role in the Scheme Was Essential

The defendant seeks a probationary sentence in part because he contends that the Guidelines "do not reflect the lack of gain Mr. Khalupsky received from participation in the conspiracy" and his "participation in the scheme was limited."  Defendant's Sentencing Letter

---

[8] Even if the enhancement did not apply, another enhancement in the same provision of the Guidelines would: the use of sophisticated means (U.S.S.G. § 2B1.1(b)(2)(10)(C)).

("Def. Sentencing Ltr.") at 1, 3.  Both of the defendant's arguments are contrary to the trial record.

First, there can be no dispute that the defendant knew that his unlawful trading resulted in millions of dollars in gains: the defendant had access to multiple Dubovoy accounts, executed trades in those accounts, and sent invoices to the Dubovoys for payment based on the millions of dollars in profits.

Second, the defendant himself earned at least hundreds of thousands of dollars for his illegal trading.  The evidence at trial showed $757,000 in wire transfers from Dubovoy accounts to Khalupsky accounts between February 2012 and June 2013.  See GX 705.  Taking a conservative view, $397,000 of the $757,000 was certainly payment for illegal trading.  Id.  The remaining $357,000 consisted of a $200,000 payment from Arkadiy Dubovoy for the purchase of Khalupsky's business (see GX 705, Tr. 1566), and a $160,000 payment from a Pavel Dubovoy account (Tanigold Assets) at a Latvian bank to one of Khalupsky's accounts (see GX 258-a1).[9] Moreover, the trial evidence suggests that Khalupsky was trading for other co-conspirators in addition to the Dubovoys.  As stated above, in September 2013, Pychnenko sent Khalupsky a brokerage account statement showing over $40,000 in profits and, in response, Khalupsky sent Pychnenko his bank account information, which, based on Khalupsky's transactions with Arkadiy Dubovoy, demonstrates a request for payment.  See GX 360-360a-1.  In short, the record is clear that Khalupsky's unlawful gains were substantial.

Third, Khalupsky played a critical role in the scheme.  As the trial made clear, in order to monetize the stolen press releases, the hackers and middlemen needed traders to quickly analyze the press releases and make trades based on them.  Khalupsky used his background as a trader and a large trading operation (Dolphin) to do just that.  And it was not easy to do: even with the stolen press releases, approximately one-third of the co-conspirators' trades lost money.  Khalupsky's role in the scheme was not limited; it was essential.

## B.   The Guidelines Are Not Overly Cumulative

The defendant contends that the Guidelines calculation, as set forth in the PSR, has overlapping enhancements that warrant a substantial downward departure or variance.  Def. Sentencing Ltr. at 7.  The Second Circuit has stated that a district court "may grant a downward departure[] where the enhancements imposed are 'little more than different ways of characterizing closely related aspects of [the defendant's] fraudulent scheme.'"  United States v. Babar, 512 Fed. Appx. 78, 81 (2d Cir. 2013) (internal citation omitted).  However, the Circuit has also "explicitly held that the decision whether to depart . . . if made at all . . . remain[s] within the discretion of the sentencing judge."  Id. (internal quotation marks omitted).  Although there may be cases where multiple enhancements overlap such that a departure may be warranted, this is not that case.  The enhancement for gain referenced above reflects the unlawful gains only in the accounts in which Khalupsky traded; the enhancement for substantial conduct occurring outside the United States reflects the fact that Khalupsky and other co-conspirators

---

[9] The $160,000 payment from Tanigold to Khalupsky was made one day after Khalupsky sent Arkadiy Dubovoy his bank account information.  See GX 250.

conducted nearly all of their criminal activity from abroad and were difficult for law enforcement to detect; the enhancement for the defendant being convicted under 18 U.S.C. § 1030 reflects specific facts related to obtaining personal information from the newswires; and the enhancement for the number of victims reflects the scope, duration and impact of the scheme.

C.    The Guidelines Are Not Higher Than Necessary

The defendant contends that the economic crimes Guidelines are "generally higher than necessary to achieve the goals of sentencing because of their focus on loss and the definitions of loss." Def. Sentencing Ltr. at 4-6. Instead, the defendant seeks to use the ABA's "alternative guidelines" for economic crimes. Id. First, as the defendant correctly points out, the ABA report and its alternative guidelines were not adopted by the Sentencing Commission. See id. at 4. While the Guidelines are advisory and the Court's inquiry does not end at its determination of a defendant's Guidelines range, it is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Second, to the extent the defendant is concerned that the Guidelines are too high because they are focused on loss, as discussed above, the government's calculation is based on the unlawful gain in the accounts in which Khalupsky himself traded. Therefore, the Guidelines here are limited directly to the defendant's involvement in the crime, and the defendant should not receive a downward variance simply because his Guidelines were calculated by reference to the fraud section of the Guidelines.[10]   As discussed above, the conservative estimate reflected in the PSR of the defendant's gain is more appropriate to determine the defendant's culpability here.

D.    A Guidelines Sentence in this Case is Especially Appropriate to Promote Respect for the Law and Effect Deterrence

A Guidelines sentence is also appropriate in order to ensure that the sentencing goals of specific and general deterrence are met.

As an initial matter, a probationary sentence is inadequate to deter this defendant from reoffending. The defendant's involvement in this scheme spanned several years. While the defendant attempts to minimize his involvement, he is not merely a trader that was kept in the dark by the Dubovoys. He was fully aware of the scope of his illegal activity on a number of

---

[10] Because the ABA guidelines do not apply here, we do not endeavor to point out the defendant's minimization of his conduct even under the ABA guidelines. For instance, the defendant indicates a zero for loss amount in his calculation, whereas the ABA guidelines indicate that Section 2B1.1 of the Sentencing Guidelines are incorporated in the ABA guidelines to determine loss, thereby permitting gain to be substituted for a loss calculation. Moreover, the defendant did not accept responsibility, but asserted his innocence at trial; therefore the two point deduction he incorporates into the ABA guidelines calculation is similarly unwarranted.

levels.  First, despite having extensive financial training and taking his Series 7 exam, the defendant was not deterred from doing exactly what he knew he should not – trading on stolen press releases ahead of the market.  The defendant was instrumental to carrying out this scheme because the information the hackers were providing to the Dubovoys would not have been monetized without the defendant and other traders like him.  Moreover, the defendant knew the hackers, as he himself admitted to law enforcement, and as discussed above, there is evidence that his involvement in this scheme was not limited to his work for the Dubovoys.  The defendant's role in this scheme undermines his argument that a probationary sentence would be significant enough to deter him from reoffending, or that it would be just punishment for his criminal conduct.

Finally, the government asks this Court to consider the need for deterrence of others.  18 U.S.C. § 3553(a)(2)(B) (sentencing court shall consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct").  Given that sophisticated fraud schemes like the instant scheme are difficult to detect and prosecute, there is greater need for general deterrence.  See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

The instant crime, even more than other fraud crimes, militates for even stronger general deterrence.  The conduct involved in this case was extremely difficult to detect.  This novel crime spanned across continents and involved myriads of bad actors, including hackers who stole the press releases, intermediaries who worked with the hackers and those buying the information, the individuals who provided the money to the hackers to obtain the stolen information and the traders.  The defendant, like his coconspirators, faced a low probability of being caught and enormous upside by engaging in the crime.  Yet, the damage to the market and to investors from such a massive hacking and insider trading is substantial.  The defendant and his coconspirators were unlikely to be caught seeing as he and others were accessing the United States markets from abroad, and as is evident from the fact that this was the first case of its scope.  As the defendant stated when the FBI arrested him in the instant case – the hackers in this case "were still active."  Tr. at 2167.  A sentence within the Guidelines is appropriate here to

ensure that a strong message of deterrence is sent to those still at large and to others tempted by similar criminal endeavors.[11]

IV.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Sentencing Guidelines range of 135-168 months' imprisonment that is sufficient, but not greater than necessary, to achieve the goals of sentencing. See U.S.S.G. § 3553(a)(2).


Respectfully Submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     _____/s/_____
Richard M. Tucker
Julia Nestor
David Gopstein
Assistant U.S. Attorneys
(718) 254-6204/6297/6153

cc:     Clerk of Court (RJD) (by ECF)
        Defense counsel (by ECF)

---

[11] The defendant contends that he should be required to pay restitution to Business Wire only for security costs incurred "in February 2012 and January 2013, when it appears that Dolphin traded in accounts around earnings and guidance reports distributed by Business Wire." Def. Sentencing Ltr. at 8.  As stated in the government's response to the defendant's PSR objections, the defendant can be held liable for all reasonably foreseeable acts of co-conspirators, not just those directly tied to his actions.  For the reasons set forth above, the repeated hacking of the newswires was reasonably foreseeable.  See, e.g., United States v. Boyd, 222 F.3d 47, 51 (2d Cir. 2000) (affirming restitution order holding defendant liable for reasonably foreseeable acts of co-conspirators); United States v. Zangari, 677 F.3d 86, 96 (2d Cir. 2012) (noting that defendant can be "held liable, jointly and severally, for all the losses suffered by the victims during the course of the conspiracy, not merely those directly tied to his action.").